1  J. MICHAEL KALER, SBN 158296
2  KALER LAW OFFICES
   9930 Mesa Rim Road, Suite 200
3  San Diego, California 92121
   Telephone (858) 362-3151
4  Email: michael@kalerlaw.com
5
6  MELODY A. KRAMER, SBN 169984
   KRAMER LAW OFFICE
7  9930 Mesa Rim Road, Suite 1600
   San Diego, California 92121
8  Telephone (858) 362-3150
   Email: mak@kramerlawip.com
9
10 Attorneys for Plaintiff JENS ERIK SORENSEN,
   as Trustee of SORENSEN RESEARCH AND
11 DEVELOPMENT TRUST
12
13            UNITED STATES DISTRICT COURT
14       FOR THE SOUTHERN DISTRICT OF CALIFORNIA
15
16 JENS ERIK SORENSEN, as Trustee of   )  Case No. 3:08-CV-00060-BTM-CAB
   SORENSEN RESEARCH AND               )
17 DEVELOPMENT TRUST,                   )  **MEMORANDUM OF POINTS AND**
                                        )  **AUTHORITIES IN SUPPORT OF**
18                          Plaintiff   )  **PLAINTIFF'S MOTION FOR**
                                        )  **APPLICATION OF 35 U.S.C. § 295**
19    v.                                )  **PRESUMPTION OF**
                                        )  **INFRINGEMENT**
20 EMERSON ELECTRIC CO., a Missouri     )
   corporation; ONE WOLRD              )
21 TECHNOLOGIES INC., a Delaware        )
   corporation; RIDGE TOOL COMPANY,    )  Date: June 20, 2008
22 an Ohio corporation; RIDGID INC., a  )  Time: 11:00 A.M.
   Delaware corporation; and DOES 1 –   )  Courtroom 15, 5th Floor
23 100,                                 )  Judge: Hon. Barry Ted Moskowitz
24                                       )
                          Defendants.   )  *NO ORAL ARGUMENTS UNLESS*
25                                       )  *REQUESTED BY THE COURT*
   _____ )
26                                       )
   and related counterclaims.           )  *Oral Argument is Respectfully Requested*
27                                       )  *at Hearing on This Matter.*
   _____ )
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION         .................................................................................. 1

FACTUAL SUMMARY ................................................................................. 1

ARGUMENT         ........................................................................................... 6

I.    THE COURT IS AUTHORIZED BY 35 U.S.C. § 295 TO
      INVOKE A PRESUMPTION OF INFRINGEMENT. ................................ 6

II.   A SUBSTANTIAL LIKELIHOOD EXISTS THAT THE ACCUSED
      PRODUCTS WERE MANUFACTURED THROUGH USE OF THE '184
      PATENTED PROCESS ........................................................................ 7

      A.    The Evidentiary Burden To Activate The 35 U.S.C. § 295 Presumption
            Of Infringement Is Lower Than A Fair Preponderance At Trial. ........ 7

      B.    Based Upon Available Evidence, A Substantial Likelihood Exists That
            The Accused Products Were Manufactured Through Use Of The '184
            Patented Process…………………………………………………….....7

      C.    Due To The Unavailability Of Compulsory Discovery To Obtain
            Additional Manufacturing Information, And The Unreliability Of Any
            Voluntarily Produced Evidence, The Available Evidence Is Sufficient
            For The Court To Invoke The 35 U.S.C. § 295 Presumption Of
            Infringement Now ........................................................................ 11

III.  PLAINTIFF HAS MADE A REASONABLE EFFORT TO DETERMINE
      THE PROCESS ACTUALLY USED IN THE PRODUCTION OF THE
      PRODUCT AND WAS UNABLE TO SO DETERMINE ........................ 11

      A.    The purpose of the 35 U.S.C. § 295 rebuttable presumption of
            infringement is to address the difficulty a patentee may have in
            proving that the patented process was actually used ........................ 12

      B.    Defendant imports products produced by a Chinese manufacturers
            not subject to U.S. discovery. ........................................................ 13

i.

C.   Even if discovery were feasible it would not be trustworthy as there is no enforcement of U.S. judgments in China. ....................... 16

D.   Plaintiff has made a reasonable effort to determine the process........ 16

CONCLUSION ................................................................................. 18

ii.

1

# TABLE OF AUTHORITIES

2

3

## Statutes/Rules

4

35 U.S.C. § 295 ........................................................ 1-3, 6, 7, 11, 12, 15, 17, 18

5

Fed.R.Civ.P., Rule 34 ........................................................................................ 15

6

7

## Cases

8

*Aventis Pharmaceuticals v. Barr Laboratories, Inc.*, 411 F.Supp.2d 490 (2006) .... 7

9

*Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364
(Fed.Cir. 1996) ................................................................................................. 7

10

11

*Nutrinova Nutrition Specialities & Food Ingredients GmbH v. Int'l Trade
Comm'n*, 224 F.3d 1356 (Fed.Cir. 2000) .............................................................. 7

12

13

*Pfizer Inc. v. F & S Alloys and Minerals Corp.*, 856 F.Supp. 808
(S.D.N.Y. 1994) ........................................................................................... 8, 16

14

15

*Popular Imports, Inc. v. Wong's Intern., Inc.*, 166 F.R.D. 276
(E.D.N.Y. 1996) ......................................................................................... 14-15

16

17

## Other References

18

*House Committee on the Judiciary, Process Patents Amendment Act of 1987*,
H.R.Rep. No. 100-60 (1987) .............................................................................. 12

19

20

*Senate Committee on the Judiciary, Process Patents Amendment Act of 1987*,
S.Rep. No. 100-83 (1987) ....................................................................... 12, 13, 16

21

22

23

24

25

26

27

28

iii.

# INTRODUCTION

Plaintiff respectfully requests that the Court grant its motion pursuant to 35 U.S.C. § 295 and invoke the presumption of infringement as to the Accused Products for the following reasons:

1.    The products accused of infringement are substantially likely to have been manufactured through use of the '184 patented process;

2.    Plaintiff has made reasonable, but unsuccessful, efforts to obtain the process actually used to manufacture the products, but has been unable to do so; and

3.    Additional, reliable evidence of the process utilized will not become available in litigation because the manufacturing is conducted in China, by non-party Chinese entities, that are beyond the reach of U.S. discovery laws and enforcement.

Plaintiff respectfully requests this relief now, irrespective of whether other portions of this case are stayed, because issues of preservation of evidence will hinge on who has the burden of proof to prove or disprove infringement at eventual trial in this matter.

# FACTUAL SUMMARY

On September 24, 2004, Plaintiff Sorensen Research and Development ("Sorensen")'s counsel, Michael Kaler, sent a formal request to Defendant Ridgid, Inc. under the United States Process Patent Amendments Act of 1988 (35 U.S.C. § 295) seeking factual information necessary to verify whether three of the products listed in the Complaint, sold, imported into, or used in the United States were made using the process patented in United States Patent No. 4,935,184 (the '184 patent"). The letter identifies two of the products which are the subject of this motion:

> ➢    Ridgid HD 3/8" VSR Drill, Model No. R7000

> ➢    Ridgid HD Reciprocating Saw, Model No. F3000

*Kramer Decl.* ¶ 4.

In a letter dated July 12, 2005, counsel for Ridgid, Inc. claimed that Ridgid did not manufacture the Accused Products, rather the Accused Products are

1.

manufactured by One World Technologies, Inc. and that the Ridgid trademark was used on the products pursuant to a trademark licensing agreement. The letter enclosed copies of Operator's Manuals for all three of accused products, pointing out the language therein stating "This product is manufactured by One World Technologies, Inc. under a trademark license from Ridgid, Inc." or similar wording. *Kramer Decl.* ¶ 5.

On the basis of these representations, in a letter dated August 11, 2005, Mr. Kaler sent a similar formal request under 35 U.S.C § 295 to One World Technologies, Inc. (hereinafter "One World"). Attached hereto as <u>Exhibit C</u> is a true and correct copy of letter dated August 11, 2005. No response was ever received. *Kramer Decl.* ¶ 6.

On March 22, 2006, Mr. Kaler sent another letter to One World regarding the original accused products and identifying additional Ridgid products that appeared to infringe on the patent, including the following products that are the subject of this motion:

➢ Ridgid 18V Cordless ½" Hammer Drill, Model No. R8411503

➢ Ridgid 12V Right Angle Impact Driver, Model No. R82233

➢ Ridgid 12V Cordless 3/8" Drill, Model No. R82001

➢ Ridgid Heavy Duty 3 Speed ½" Right Angle Drill, Model No. R7130

➢ Ridgid Heavy Duty VSR Drywall Screwdriver, Model No. R6000

➢ Ridgid 7 ¼" Worm Drive Saw, Model No. R3210

➢ Ridgid Heavy Duty 11A Reciprocating Saw, Model No. R3001

➢ Ridgid Heavy Duty Variable Speed Belt Sander, Model No. R2720.

Again, no response was received. *Kramer Decl.* ¶ 7.

On June 7, 2006, another counsel for Sorensen, Melody Kramer, sent a follow-up request for information to One World, again indicating that One World's failure to respond would be supportive of the 35 U.S.C. § 295 presumption of infringement. *Kramer Decl.* ¶ 8.

1    Ms. Kramer received a letter dated June 13, 2006 from Robert Bugos,
2   identified as General Counsel, on letterhead for Techtronic Industries North
3   America, Inc.   Mr. Bugos claimed an investigation and determination of non-
4   infringement had been made, but gave no specific information of his source of
5   information or nature of investigation.  Mr. Bugos also claimed the existence of prior
6   responses to "your law firm" confirming use of a non-infringing process, even
7   though no such responses had been given.  *Kramer Decl.* ¶ 9.[1]

8    By letter dated July 10, 2006, Ms. Kramer requested sworn declarations to
9   back up Mr. Bugos' assertions as to the manufacturing process for the Ridgid
10  products from a U.S. resident.  *Kramer Decl.* ¶ 11.

11   Mr. Bugos failed and refused to provide such declarations, suggesting instead
12  an affidavit that Techtronic had contacted its parent company and were confident
13  that the information received was accurate.  *Kramer Decl.* ¶ 12.

14   Mr. Bugos, and a subsequent attorney involved in the matter, Mr. Mallin, were
15  given numerous opportunities to have their client(s) sign sworn declarations as to the
16  manufacturing process for the Ridgid products, but neither provided any declarations
17  or other admissible evidence.  *Kramer Decl.* ¶ 13.

18   On December 7, 2007, Ms. Kramer sent formal infringement notices on the
19  Ridgid products to Emerson Electric Co. and Ridge Tool Company, two other
20  companies that appeared to be involved in the manufacture, import, sale and/or offer
21  for sale of some of the accused Ridgid products.  Those letters both identified all of
22  the products that are the subject of this motion and made requests pursuant to 35
23  U.S.C. § 295 for actual manufacturing information.  *Kramer Decl.* ¶ 14.

24      [1] In prior communications between Mr. Kaler and Mr. Bugos, Bugos had asserted
25  that some accused Ryobi-brand products were manufactured with a process that would not
    infringe the '184 patent. However, despite repeated request, neither Mr. Bugos nor his
26  company, would back up the self-serving exculpatory process assertions about Ryobi
    products under oath.  Those communications did not involve any Ridgid-brand products.
27  *Kramer Decl.* ¶ 10.

28

1    Neither Emerson nor Ridge Tool provided any admissible evidence of the

2    actual manufacturing process either.   The lawsuit was filed on January 10, 2008.

3    *Kramer Decl.* ¶ 15.

4    Shortly before filing suit, Ms. Kramer became aware of sworn testimony given

5    by Mr. Bugos in December 2006 in a Pennsylvania products liability case that

6    involved his understanding of who manufactured Ridgid tools.  *Kramer Decl.* ¶ 16.

7    The testimony contained numerous contradictions, including those footnoted below.

8    In material part, Mr. Bugos, having identified himself as "general counsel for

9    Techtronic Industries North America, Inc. and its various subsidiaries . . . including

10   One World Technologies, Inc." (*Kramer Decl.* ¶ 17, Exhibit G, page 5:23-6:4)

11   testified as follows:

12   Q.    Does One World Technologies manufacture any products under
13         the Ridgid name?
     A.    No. . . .
14

15   (page 6:24-7:2)[2]

16   A.    Ridgid brand products are marketed by One World Technologies
17         to the Home Depot, are sourced through a parent company,
18         ultimate parent company, Techtronic Industries Company
           Limited.
19   Q.    Does One World Technology design the tools?
20   A.    One World Technologies, Inc., I imagine has had design input in
           connection with the line of various Ridgid brand products.
21

22   (page 7:23-8:3)

23   A.    We [One World] manufacture Ridgid brand products[3] as a
24         supplier to Home Depot.  There's a trademark license from the
           owner of the trademark, which I presume to be, as you've been
25
     _____

26   [2] This statement is contrary to the owner's manual information for Ridgid products.
     See *Kramer Decl*., Exhibit B.
27

28   [3] This statement is consistent with the owner's manual information for Ridgid
     products (*Kramer Decl*., Exh B), but contradicts Mr. Bugos' prior representation.

4.

1
2
     calling them, Ridgid, Inc., so I believe that's the trademark owner. I understand it to be some entity owned by or controlled by Emerson.

3
4
Q.    . . . What's the relationship between Emerson and One World Technologies?

5
A.    I believe we service, we provide customer service under contract for certain products that were manufactured by Emerson[4].

6
7
(page 15:12-24).

8
Q.    Who manufactures the tools?

9
10
A.    Well a variety of people manufacture the products. They are sourced through our parent company and it might be manufactured by them or it might be manufactured by a third party that they contract.

11
12
Q.    Okay, so let me try to understand this. You source the tools, which means? What does source mean in your mind?

13
14
15
A.    Well Home Depot buys them from us, we buy them from somebody else. The third party we buy them from is our parent company in Hong Kong. Our parent company in Hong Kong may be the manufacturer, or it may be somebody else.[5]

16
(page 18:10-24)

17
18
A.    The corporate entity, One World Technologies, Inc., technically does not manufacture anything.[6]

Q.    So is it Techtronic that manufacturers them?

19
A.    It may be, or they may source it from a third party.

Q.    A third party not related to Techtronic, or another subsidiary?

20
A.    It could be either.

21
. . .

22
A.    Well I don't want to mislead you. Our corporate entity, One World Technologies, Inc., plays a major role in the development

23
24
    [4] This statement is inconsistent with Mr. Bugos' prior representation *and* inconsistent with the owner's manual information.

25
26
    [5] This contradicts all of the previous statements regarding who manufacturers the products.

27
28
    [6] This contradicts with the owner's manual statements and prior statements of Mr. Bugos.

of the product and decisions in regards to what that product will
be like. We may have engineering input into the design of the
product, in some cases we may not.

(page 19:6-20:4)

After the above-captioned suit was filed, attorney Mr. Mallin sent a self-serving document from a Chinese national who is not subject to the jurisdiction of U.S. courts. The Chinese signator purported to have corporate knowledge of no fewer than three United States companies and one Hong Kong company. The document contained statements that contradicted with Mr. Bugos' sworn testimony regarding identification of the manufacturers of Ridgid-brand products. It further, made numerous statements without adequate foundation or detail, and claimed that the Ridgid power tools were manufactured with a non-infringement process. It did not identify the location of manufacture. *Kramer Decl.* ¶ 18.

Plaintiff has no way to confirm the identity or *bona fides* of the purported signator of the self-serving document. Plaintiff is unable to depose him regarding the basis for his claimed knowledge, and has no way to delve into the inconsistencies between his many statements and those of Mr. Bugos, the products owner's manuals, or any other source of information. *Kramer Decl.* ¶ 19.

## ARGUMENT

I.    THE COURT IS AUTHORIZED BY 35 U.S.C. § 295 TO INVOKE A PRESUMPTION OF INFRINGEMENT.

The United States Process Patent Amendments Act of 1988 provides as follows:

Sec. 295. Presumption: Product made by patented process

In actions alleging infringement of a process patent based on the
importation, sale, offer for sale, or use of a product which is made from
a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the

6.

patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

**the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.**

35 U.S.C. § 295 (emphasis added).

35 U.S.C. § 295 is a statutory burden-shifting provision, whereby the accused infringer's product is presumed to have been made by the patented process. When a court finds that the patent holder is unable to determine the process that was used by the manufacturer, the patent holder's showing of a "substantial likelihood" of infringement shifts the burden of establishing that the product was not made by the patented process to the alleged infringer, the party best able to obtain the evidence of the process used. *Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1368 n.6 (Fed. Cir. 1996); *Nutrinova Nutrition Specialties & Food Ingredients GmbH v. Int'l Trade Comm'n*, 224 F.3d 1356, 1359-60 (Fed. Cir. 2000).

II.    SUBSTANTIAL LIKELIHOOD EXISTS THAT THE ACCUSED PRODUCTS WERE MANUFACTURED THROUGH USE OF THE '184 PATENTED PROCESS.

A.    The Burden To Activate The 35 U.S.C. § 295 Presumption Of Infringement Is Lower Than A Fair Preponderance At Trial.

The "substantial likelihood" test of the § 295 has not yet been thoroughly developed in the published cases. *See Aventis Pharmaceuticals v. Barr Laboratories, Inc.*, 411 F.Supp.2d 490 (2006). By contrast, the legislative history is unambiguous that a "substantial likelihood" standard is less than a preponderance of the evidence at trial:

7.

> Exactly how much evidence will be needed in particular situations to satisfy the "substantial likelihood" condition will depend on the circumstances. However, **the patentee's burden would be less than that of proving successfully at trial by a fair preponderance of the evidence** that a product in question was in fact made by the patented process but would be more than a slight possibility that the product was so made.

Senate Committee on the Judiciary, Process Patents Amendment Act of 1987, S. REP. NO. 100-83, at 45 (1987) (emphasis added).

In *Pfizer Inc. v. F & S Alloys and Minerals Corp*. 856 F.Supp. 808 (S.D.N.Y., 1994) the court interpreted the above rule to mean that the moving party "must establish by a preponderance of the evidence that there is a substantial likelihood" of infringement. *Id.* It should be noted that the *Pfizer* Court's construction of the term, effectively describing a preponderance of a preponderance, is much like the multiplication of two fractions, the result would be much less than the "just more likely" standard that defines a preponderance of evidence at trial.

   B.   <u>Based Upon Available Evidence, A Substantial Likelihood Exists That The Accused Products Were Manufactured Through Use Of The '184 Patented Process.</u>

Plaintiff's expert has physically examined the Accused Products and determined that every element of Claim 1 of the '184 patented process that can be determined without access to the manufacturer's first-hand information is present. *Brown Decl.* ¶¶ 3, 56. Access to the manufacturing plant and manufacturers themselves is unavailable in this action because the manufacturer is a Chinese corporation. *Kramer Decl.* ¶ 6. Furthermore, as will be described later in the brief, Sorensen cannot compel access to inspect Chinese manufacturing plants and depose knowledgeable persons about the processes utilized, even if they are identified.

The '184 patent, entitled "Stabilized Injection Molding When Using a Common Mold Part With Separate Complimentary Mold Parts," was issued on June

8.

19, 1990. The '184 patent provides a long-sought elegant solution to a pervasive problem in the injection molding of hollow plastic products, i.e., how to stabilize the mold parts against relative movement during the highly pressurized injection of melted plastic. *Brown Decl.* ¶ 18.

The '184 patented method is directed toward stabilizing the mold parts against relative movement during the second injection of an injection molding process whereby laminated plastic parts are produced sequentially in two cavities made up of at least one common mold part and at least two different complementary mold parts. The '184 patent claims a method to stabilize the mold parts during the second or later plastic injection by molding one or more stabilizing regions into the first plastic material component(s) that rigidly secure the two mold parts against displacement during the second or later injection. *Brown Decl.* ¶ 19.

The existence of each of the elements of Claim 1 of the '184 patent in the process used to manufacture the Accused Products has never been contested or refuted by Defendants via competent, sworn testimony, though numerous requests to provide such evidence have been made. See *Kramer Decl.*

In the expert opinion of Mr. Brown, the Accused Products are plastic products substantially likely to be made using the '184 patented process. From his examination and analysis, it appears that the Accused Products are manufactured utilizing the '184 patented process as described in Claim 1 of the '184 patent as follows. *Brown Decl.* ¶ 42.

The Accused Products exhibit each of the elements of the '184 patented process in their manufacture that can be discerned without access to the mold tooling. *Brown Decl.* ¶ 43.

The Accused Products are thin-walled, hollow plastic products. *Brown Decl.* ¶ 44.

The Accused Products have laminated walls produced by injection molding utilizing a first mold cavity and a second mold cavity.      *Brown Decl.* ¶ 45.

1    My examination shows that portions of the Accused Products walls are
2    laminated, and the lamination is terminated at the rim of the Accused Products.
3    *Brown Decl.* ¶ 46.

4    The Accused Products possess stabilizing regions molded into the first plastic
5    material components that rigidly secure the two mold parts against displacement
6    during the second injection. *Brown Decl.* ¶ 47.

7    The Accused Products have a closed end and an open end, and are produced
8    by cyclic injection molding. *Brown Decl.* ¶ 48.

9    The Accused Products are molded utilizing a first mold cavity and a second
10   mold cavity, where the first mold cavity utilized to mold the Accused Products is
11   formed of a first common mold part and a first complementary mold part, and the
12   second mold cavity utilized to mold the Accused Products is with high confidence
13   formed of the same first common mold part (assumed hereafter) and a second
14   complementary mold part. *Brown Decl.* ¶ 49.

15   The following steps are followed in production of the Accused Products:  the
16   first common mold part and the first complementary mold part are combined to
17   assemble the first mold cavity into which a first plastic material is injected.  The
18   injected first plastic material is solidified to form a first plastic material component
19   of the Accused Products.  The first common mold part and the first complementary
20   mold part then separate. *Brown Decl.* ¶ 50.

21   Next, the first common mold part and the second complementary mold part
22   are then combined to assemble the second mold cavity of the Accused Products, with
23   the first plastic material component attached to the first common mold part during
24   assembly of the second mold cavity.  The first plastic material component is then
25   contained within the second mold cavity.  The first plastic material component has
26   one or more stabilizing regions that rigidly secure the first common mold part, in
27   position in relation to the second complementary mold part. *Brown Decl.* ¶ 51.

28   A second plastic material having different characteristics than the first plastic

10.

material is injected into the second mold cavity.  The second plastic material then solidifies to form a second plastic material component that combines with the first plastic material component to produce the Accused Products.  *Brown Decl.* ¶ 52.

During the injection of the second plastic material, the stabilizing regions of the first plastic material component restrict displacement of the first common mold part in relation to the second complementary mold part.  The stabilization allows the Accused Products to be produced with improved control of its dimensions.  *Brown Decl.* ¶ 53.

Both the first plastic material and the second plastic material of the Accused Products reach the rim of the Accused Products, forming a laminated area at the rim, thus satisfying all elements of Claim 1 of the '184 patent.  *Brown Decl.* ¶ 54.

The presence of the elements of the '184 patent can be determined with high likelihood through physical and destructive examination of the Accused Product.  All of those elements that can be determined from an assessment of the Accused Product have been determined to be present.  With regard to those few elements for which absolute determination cannot be made without inspection of the mold tooling, the best evidence that can be gathered from examination of the Accused Products shows that those elements were very likely present in the Accused Processes.  Complete confirmation of the existence of a common mold part usually requires access to the actual injection molds and manufacturing equipment.  *Brown Decl.* ¶ 55.

Mr. Brown's investigation leads him to conclude that each of the Accused Products are very likely to be produced with a process that infringes claim 1 of the '184 patent. These conclusions are derived from combining my knowledge of commercial injection molding practices, and my examination of the Accused Products.  Mr. Brown have concluded that the only commercially practical processes in which to make the Accused Products are processes that infringe claim 1 of the '184 patent.  Mr. Brown have further concluded that the physical evidence indicates the use in the Accused Products of processes that infringe claim 1 of the '184 patent,

11.

thus satisfying the "substantially likely" requirement of 35 U.S.C. § 295. *Brown Decl.* ¶ 56.

      C.    <u>Due To The Unavailability Of Compulsory Discovery To Obtain Additional Manufacturing Information, And The Unreliability Of Any Voluntarily Produced Evidence, The Available Evidence Is Sufficient For The Court To Invoke The 35 U.S.C. § 295 Presumption Of Infringement Now</u>.

Complete confirmation of the existence of a common mold part usually requires access to the actual injection molds and manufacturing equipment. *Brown Decl.* ¶ 55.

Plaintiff has not been granted access to the manufacturing plants for the Accused Products, and cannot compel plant inspections or other discovery in China as more fully described in Section III, B and C, below. Moreover, even if a plant inspection could be arranged, no depositions of knowledgeable Chinese nationals can be conducted without violating Chinese criminal statutes (as explained in more detail hereinbelow), so there is no viable way to test the evidence of manufacture.

Because the actual manufacturing process at issue is located in a country that is inaccessible to any form of meaningful compulsory discovery, the Court need not wait until later in these proceedings to invoke the presumption of infringement. This is precisely the situation envisioned by the drafters of Section 295 for which the presumption was created.

III.    PLAINTIFF HAS MADE REASONABLE EFFORTS TO DETERMINE THE PROCESS ACTUALLY USED IN THE PRODUCTION OF THE PRODUCT AND WAS UNABLE TO SO DETERMINE.

      A.    <u>The 35 U.S.C. § 295 Presumption Of Infringement Is Intended To Address The Difficulty Of Proof That The Patented Process Was Used.</u>

35 U.S.C. § 295 was passed to help U.S. patent holders deal with the increasing number of foreign manufactures importing infringing products into the United States, and the difficulty in obtaining discovery of manufacturing processes from such foreign manufacturers:

> This presumption addresses a great difficulty a patentee may have in proving that the patented process was actually used in the manufacture of the product in question in those cases, where the manufacturer is not subject to discovery under the Federal Rules of Civil Procedure. For example, patent owners will frequently be unable to obtain information concerning the nature of processes being practiced by foreign manufacturers. Shifting the presumption should create no substantial burden, as an accused infringer should be in a much better position to establish that the product was made by another method.

*House Committee on the Judiciary, Process Patents Amendments Act of 1987*, H.R. REP. NO. 100-60, at 16 (1987).

The intent of Section 295 is to place the burden of proving/disproving infringement on the party in the best position to offer the proof. In most cases, the importer who, by reason of their relationship with the manufacturer, is in the best position to get process information:

> Importers, for example, because of their relationships with foreign manufacturers, may be able to exert pressure on such manufacturers to produce the necessary information. Users and sellers who purchase possibly infringing articles from importers may be able to exert similar pressure on those importers, who would in turn influence foreign manufacturers.

*Senate Committee on the Judiciary, Process Patents Amendment Act of 1987*, S. REP. NO. 100-83, at 57 (1987).

With this in mind, the legislature intended the threshold for the burden shifting to be less than that of requiring the patent holder to submit letters rogatory:

A reasonable effort requirement could easily be satisfied in the United

13.

States through our discovery procedures.  For a foreign manufacturer the patentee would have to take some reasonable step, such as writing to the manufacturer, to determine how the product was made and to have been unsuccessful in this regard.  The reasonableness of the effort would depend on the facts of the case but should generally avoid the need for such measures as letters rogatory or suits in a foreign country.

*Senate Committee on the Judiciary, Process Patents Amendment Act of 1987*, S. REP. NO. 100-83, at 45 (1987).

The legislative history is abundant that the very purpose of section 295 is to lift from the shoulders of patent holders the undue burden of being forced to pursue extrajudicial discovery options outside the Federal Rules against foreign manufactures in foreign countries, where there is no incentive, nor compelling judicial power, to cause the party to cooperate honestly.

In this case, Defendants import the Accused Product for sale in the U.S. According its own statements, Defendants are not the manufacturers.  The manufacturers of the Accused Products are foreign manufacturers that are not subject to U.S. discovery procedures under the Federal Rules of Civil Procedure.

B.     Defendants Import Products Produced by Chinese Manufacturers Not Subject to U.S. Discovery.

Two agreements govern the ability of the U.S. courts to compel discovery including depositions in China.  Neither agreement provides an avenue for reasonable discovery in this matter. *Truitt Decl.* ¶ 5.

Article 27(1) of the U.S.-China Consular Convention of 1980 allows consular officers of either nation to take and witness statements and testimony for use in connection with a legal proceeding of either nation; 33 U.S.T. 3048.  China clarified this Convention in a series of diplomatic notes from the Chinese Ministry of Foreign Affairs to the U.S. Embassy in Beijing.  The Chinese government stated that depositions under oath may only be taken by a U.S. Consular official or foreign attorney if, and only if, Beijing first gives express permission after receiving a letter

14.

1  rogatory through the Bureau of International Judicial Assistance of the Ministry of

2  Justice of the People's Republic of China. (Diplomatic Note No. 106 dated 6

3  November 1981, Diplomatic Note No. 88 dated 11 September, and Diplomatic Note

4  No. 77 dated 11 September 1996).  *Truitt Decl.* ¶ 6.

5  On only one occasion has the Chinese government ever granted permission for

6  a limited deposition. *United States v. Leung Pak Lun, et al* CR 88 0214-WHO.  In

7  connection with this one deposition, China informed the U.S. government that the

8  grant of permission should not be construed as precedent.  *Truitt Decl.* ¶ 7.

9  The second agreement governing discovery in China is The Hague Conference

10  on Private International Law Convention on the Taking of Evidence Abroad in Civil

11  or Commercial Matters.   Upon China's accession to The Hague Evidence

12  Convention, China declared that the provisions of Chapter II of the Convention

13  except for Article 15 will not be applicable; China means that diplomatic and

14  consular officers may take evidence without compulsion of nationals of the United

15  States, only with express permission given upon application to the Chinese

16  government. *See* Department of State, *China Judicial Assistance*, available at

17  http://travel.state.gov/law/info/judicial/judicial_694.html.   No depositions have ever

18  been allowed under this Convention.  Further, it is not possible for any U.S. Court to

19  compel production of evidence thereby.  *Id*.  *Truitt Decl.* ¶ 8.

20  The Chinese strictly guard the laws on administering and swearing of oaths.

21  **This makes voluntary depositions between private parties . . . a criminal act.**

22  When foreign attorneys or consular officials administer an unauthorized oath in

23  China, the penalties include arrest, detention, expulsion, or deportation of all

24  participants in the oath. *Id.*  See *Truitt Decl.* ¶ 9.

25  In *Popular Imports, Inc. v. Wong's Intern., Inc.*, 166 F.R.D. 276 (E.D.N.Y.

26  1996) the court upheld the admissibility of depositions taken in China, without the

27  use of letters rogatory.  However, this was only because the issue of legality had not

28  been raised prior to the depositions and was deemed waived:

> Had plaintiff raised this issue prior to the taking of the depositions, and had the Court concluded that the procedures proposed would in fact have violated Chinese law, the Court would of course have been loathe to authorize procedures that would have put counsel at risk and might well have generated diplomatic friction.

*Id.* at 279. *Truitt Decl.* ¶ 10.

Requiring Plaintiff to file letters rogatory with the Chinese consulate, when there is no reasonable hope of assistance is beyond the scope of a "reasonable effort." Additionally, the only proper method for discovery in China is by submitting a letter rogatory and anything short of such effort would subject Plaintiff to criminal sanctions under Chinese law.

Moreover, the available discovery against the Defendants is highly unlikely to result in the acquisition of relevant information about the manufacturing process actually used. The Federal Rules of Civil Procedure requires a party to produce only those documents and materials and allow access to only that property in their possession, custody, or control. FED. R. CIV. P. 34. Because Defendants do not actually manufacture the Accused Products, they will not be able to produce evidence through discovery that will allow Plaintiff, or the Court, to determine with any reasonable degree of reliability or certainty the method used for manufacture of the Accused Products.

In short, Plaintiff will not be able to inspect plants, or conduct other compulsory discovery from the actual manufacturers of the Accused Products, and thus cannot obtain any first-hand information of the actual manufacturing process. Further, any information obtained from China is inherently unreliable due to the lack of any capacity of the Court to enforce orders against any Chinese nationals or companies. This situation is exactly what 35 U.S.C. § 295 was designed to address.

C.    <u>Even if discovery were feasible it cannot be trusted as there is no enforcement of U.S. judgments in China.</u>

16.

1    U.S. judgments cannot and will not be enforced in China.  Chinese law
2    requires the existence of a treaty or de facto reciprocity in order to enforce a foreign
3    judgment.  Neither of these exists between the United States and China. *Truitt Decl.*
4    ¶ 11.

5    Research reveals specific cases in which enforcement was refused and no
6    cases in which enforcement was granted. *See* Clarke, Donald C., "The Enforcement
7    of United States Court Judgments in China: A Research Note" (May 27, 2004).
8    GWU Legal Studies Research Paper No. 236 Available at SSRN:
9    http://ssrn.com/abstract=943922.  *Truitt Decl.* ¶ 12.

10   Without the penalty of perjury or the threat of court sanction, no evidence
11   gathered in China, via deposition or any other mechanism can be trusted.  As the
12   Court lacks any power to enforce its edicts against Chinese witnesses or companies,
13   any evidence obtained thereby should be treated as so untrustworthy and unreliable
14   as to be deemed inadmissible.

15
16   D.    <u>Plaintiff has made reasonable efforts to determine the process, but has
     been unable to obtain necessary information.</u>
17
18   The legislative history gives guidance as to what constitutes a reasonable
19   effort:
20       For a foreign manufacturer the patentee would have to take some
         reasonable step, such as writing to the manufacturer, to determine how
21       the product was made and to have been unsuccessful in this regard.
22   S. Rep. No. 100-83, at 45 (1987).

23   In *Pfizer Inc. v. F & S Alloys and Minerals Corp*, 856 F.Supp. 808 (S.D.N.Y.,
24   1994.) the Court ordered the burden shifted to the defendant to prove that it did not
25   infringe pursuant to section 295 on similar facts.  In that case, Pfizer sued the
26   importer of an infringing chemical agent and the foreign manufacturer (Chinese).
27   However, the Chinese manufacturer was dismissed from the case on jurisdictional
28   grounds, as it did not actively import the infringing product into the U.S.  Pfizer's

17.

attempted discovery directed to the Chinese company resulted in nothing but letters from the Chinese company with unsupported denials of infringement. *Id.* The Court ordered the section 295 presumption against the importer as they were the party best able to obtain evidence of the process actually used. *Id.* In view of fact that discovery in China suffers the triple whammy of being: criminal, impracticable and untrustworthy; the section 295 presumption is the only viable manner such a dispute can be resolved.

Here, Plaintiff is in similar situation. Plaintiff made a formal, written request for information from Defendants that would allow it to determine the process actually used in production of the Accused Products. Defendants confirmed that it was not the actual manufacturer (it referenced the supplier TTILC), but failed to provide admissible actual process information. Despite ongoing communications between the parties for three years, Plaintiff has still received nothing beyond inadmissible hearsay assertions as to the actual process.

Despite the passage of more than three years since the original request and notification regarding 35 U.S.C. § 295, none of the Defendants have ever provided any verified description of the manufacturing process, never identified the name(s) or location(s) of its manufacturer(s), never provided any photographs, mold designs, product specifications, nor any other information or materials that would allow Plaintiff to determine the process actually used to manufacture the Accused Products.

Plaintiff has made reasonable efforts to determine the process actually used in the production of the product, but has been unable to so determine. Plaintiff need not blindly accept unsworn statements and purported second-hand hearsay information. Furthermore, because the actual manufacture of the Accused Products occurs in China, Plaintiff will not be able to obtain any reliable information through discovery for the reasons set forth in detail above, making the issue of application of the 35 U.S.C. § 295 presumption ripe for immediate decision by this Court.

1
2
**CONCLUSION**

3      Plaintiff has established through expert testimony and documentary evidence

4  that a substantial likelihood exists that the '184 patented process was used in the

5  manufacture of the Accused Products.    Plaintiff has taken reasonable, but

6  unsuccessful, efforts to ascertain the actual manufacturing information for the

7  Accused Products.

8      There is no reasonable avenue for additional discovery as the Accused

9  Products are manufactured in China, inaccessible to Plaintiff in the course of

10  discovery.

11      This matter should be resolved now, irrespective of whether other portions of

12  this case are stayed (as has been requested), because issues of preservation of

13  evidence will hinge on who has the burden of proof to prove or disprove

14  infringement at eventual trial in this matter.

15      Therefore, Plaintiff has met its burden under 35 U.S.C. § 295 and the Court

16  should issue an order invoking the burden shifting provisions of 35 U.S.C. § 295,

17  requiring Defendants to prove that the Accused Products were  not made with the

18  '184 patented process.

19
20  DATED this Wednesday, April 23, 2008.

21                              JENS ERIK SORENSEN, as Trustee of
                               SORENSEN RESEARCH AND DEVELOPMENT
22                              TRUST, Plaintiff

23
24                              /s/ Melody A. Kramer
                               _____
25                              J. Michael Kaler, Esq.
                               Melody A. Kramer, Esq.
26                              Attorney for Plaintiff

27
28

19.