**EXHIBIT D**



Techtronic Industries North America, Inc.

# *FAX TRANSMISSION*

| To: | Melody Kramer, Esq. | Fax: | (858) 824-9073 |
|-----|---------------------|------|----------------|
| Company: | Kramer Law Office | Tel: | (858) 362-3150 |
| | | | |
| From: | Robert A. Bugos | Fax: | (864) 964-3350 |
| Company: | Techtronic Industries North America, Inc. | Tel: | (864) 964-3308 |

Date:    June 13, 2006                        Page 1 of 3

## CONFIDENTIALITY NOTE

**This information is intended only for the use of the individual to whom it is addressed and may contain information that is privileged and/or confidential. If you have received this communication in error, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by telephone at 864-964-3308 and return the original message to us by mail.**

Techtronic Industries North America, Inc.
1428 Pearman Dairy Road, Anderson SC, USA
Tel 864.226.6511   1.800.323.4615   www.ttigroup.com



**Techtronic Industries North America, Inc.**

Writer's Direct Dial: 864.964-3308
Writer's Direct Fax: 864.964-3350
Writer's Email: bob.bugos@ttigroupna.com

June 13, 2006

Sent via U.S. Mail / Facsimile

Melody A. Kramer, Esq.
Kramer Law Office
9930 Mesa Rim Rd., Suite 1600
San Diego, California 92121

Re:     Sorensen Research & Development Trust v. One World Technologies, et al
        U.S. Patent No. 4,935,184

Dear Ms. Kramer:

This is in regard to various letters that have been referred to my attention regarding products manufactured by or for various of our affiliates bearing the RYOBI, RIDGID or SENCO products.

Specifically, you have identified various products that you suspect infringe your client's U.S. Pat. No. 4,935,184, including 6 RYOBI brand products, 29 CRAFTSMAN brand products, 22 RIDGID brand products, and one SENCO brand product.

In response to your firm's correspondence, we have investigated and determined that none of the products you identified infringe that patent. Specifically, we reviewed the patent and confirmed that our products are not manufactured using a process wherein two molding operations are performed with a common mold part shared by the two molds. Our analysis of the patent in question confirms that the presence of a common mold part is a limitation of each claim of your patent. In each case, there has been a response to your law firm confirming that the manufacturing process used in the manufacture of each of the products you identified does not involve such a component.

To avoid needless repetition, we confirmed that none of the power tools manufactured by or for our affiliates under any of those three brands utilize such a process. (One of our subsidiaries, Milwaukee Electric Tool Corporation, has executed a license agreement with your client, and so I make no representation regarding its products.)

After receiving our confirmation, you asked us to provide an affidavit, which we would reluctantly do, if it would bring an end to your fishing expedition. However, in our opinion, the affidavit you requested is out of line, in that it goes beyond the scope of what is plausibly covered by your client's patent. You have asked us to conduct an additional investigation to determine whether the molded parts are moved from one mold to another by a single component. We are unable to identify any claim in your client's

patent that would warrant such an investigation. Consequently, we choose not to devote our organization's resources to this task.

If you can identify a valid claim that might be infringed based solely on the use of a single piece of tooling to transport a molded part from one mold to another, or if you are willing to confine the request for an affidavit to the information previously provided to you, we would respond accordingly.

Regards,

Robert A. Bugos
General Counsel

RAB; lmj

# EXHIBIT E

**Kramer Law Office, Inc.**

9930 Mesa Rim Rd., Ste. 1600
San Diego, California 92121
Phone 858/362-3150
Fax 858/824-9073

**Melody A. Kramer, Esq.**
mak@kramerlawip.com

$(0.\text{--}7$

December 7, 2007

David N. Farr, CEO
W.W. Withers, General Counsel
Emerson Electric Co.
8000 West Florissant Avenue
St. Louis, Missouri 63136

**CONFIDENTIAL OFFER OF COMPROMISE**
Subject To Federal Rules of Evidence § 408

RE:     Sorensen Research & Development Trust v. Emerson, et al
        U.S. Patent No. 4,935,184

Dear Mssrs. Farr and Withers:

We have examined several Ridgid-brand products that incorporate plastic housings manufactured with plastics with different characteristics. From our experts' extensive examination and testing, we have determined that the plastic housings of some of these products are "substantially likely," within the meaning of 35 U.S.C. § 295, to be fabricated utilizing a process that infringes United States Patent Number 4,935,184 ("the '184 patent"). We are continuing our investigations into other Ridgid products. Our records indicate that neither Emerson, nor any other company associated with the manufacture, import, sale and/or offer for sale of Ridgid products are currently licensed to utilize the '184 patented method.

I represent the Sorensen Research & Development Trust ("Sorensen Research & Development"), the owner of the '184 patent entitled "Stabilized Injection Molding When Using a Common Mold Part With Separate Complimentary Mold Parts," issued on June 19, 1990. Sorensen Research & Development is a leader in the field of plastic injection molding technology. Its patents, both U.S. and foreign, are at the forefront of advances in injection molding and disclose valuable knowledge to the plastics manufacturing industry in the form of significant improvements to the processes used for the molding of plastic products. Sorensen Research & Development licenses this valuable technology to various industries and promotes cutting-edge research and development efforts thereby fostering progress and the discovery of scientific

Mssrs. Farr and Withers
December 7, 2007
Page 2

advancements in injection molding. Sorensen Research & Development's patents teach innovative and cost-effective manufacturing process solutions that provide licensees with a competitive advantage. Its patents further provide companies with limited capital, or limited accessibility to highly skilled scientists, access to advancements in research and development that would otherwise be unattainable.

Specifically, the '184 patent provides a long-sought elegant solution to a pervasive problem in the injection molding of hollow plastic products. The problem solved by the patented process is that the highly pressurized injection of molten plastic forces the mold parts to move relative to each other. This mold part movement causes misalignment of the mold parts and results in products with walls of undesirable dimensional variations if not adequately controlled. The '184 patented process provides the ability to supplement and assist a number of other mold stabilization methods, such as the use of mechanical locking devices to achieve partial stabilization.

The '184 patented method facilitates production of plastic components made with two or more plastic injections with different characteristics. The '184 patented technology provides an improved method for reducing mold misalignment during the injection molding process. This method assists the manufacturer in producing parts with improved dimensional control fabricated within narrower tolerances. The improved dimensional control can be used to produce components with more refined fit and finish, improving the overall quality and appearance of the product. Moreover, the improved dimensional control can facilitate a reduction in material wasted and a reduction in manufacturing cycle time, both of which can be leveraged into reduced manufacturing cost.

The '184 patented method reduces movement of the mold parts during injection molding of laminated plastic parts produced sequentially in at least two cavities made up of at least one common mold part and at least two different complementary mold parts. The '184 patent teaches a method to stabilize the core during the second or later plastic injection by molding one or more stabilizing regions into the first plastic material component(s) that impede relative movement of the mold parts during the second or later injection. By providing this additional stabilization of the mold parts against movement during the injection process, hollow products may be produced having more controlled dimensions. Use of the '184 process offers significant benefit in the manufacture of two-plastic plastic housings and similar products.

The following table lists Ridgid products that our inspection show to be substantially likely, within the meaning of Title 35 U.S.C. § 295, to have been produced through the use of a process which infringes the '184 patent (hereinafter, "Accused Products").

Mssrs. Farr and Withers
December 7, 2007
Page 3

| ***Accused Product, Model No.*** |
| --- |
| Ridgid 18V Cordless Reciprocating Saw, Model No. R844 |
| Ridgid HD 3/8" VSR Drill, Model No. R7000 |
| Ridgid HD Reciprocating Saw, Model No. F3000 |
| Ridgid 18V Cordless ½" Hammer Drill, Model No. R8411503 |
| Ridgid 18V Cordless 1/2 " Drill, Model No. R84015 |
| Ridgid 18V Cordless Drill, Model No. R84001 |
| Ridgid 14.4V Cordless ½" Drill, Model No. R83015 |
| Ridgid 12V Right Angle Impact Driver, Model No. R82233 |
| Ridgid 14.4V Impact Driver, Model No. R82320 |
| Ridgid 12V Cordless 3/8" Drill, Model No. R82001 |
| Ridgid Heavy Duty 3 Speed ½" Right Angle Drill, Model No. R7130 |
| Ridgid Heavy Duty 2 Speed ½" VSR Drill, Model No. R7100 |
| Ridgid Heavy Duty VSR Drywall Screwdriver, Model No. R6000 |
| Ridgid Heavy Duty ½" VSR Hammer/Pulse Drill, Model No. R5010 |
| Ridgid 7 ¼" Worm Drive Saw, Model No. R3210 |
| Ridgid Heavy Duty 7 ¼" Circular Saw, Model No. R3200 |

Mssrs. Farr and Withers
December 7, 2007
Page 4

| *Accused Product, Model No.* |
| --- |
| Ridgid 18V Cordless Jig Saw, Model No. R843 |
| Ridgid Variable Speed Orbital Jig Saw, Model No. R3120 |
| Ridgid Heavy Duty 11A Reciprocating Saw, Model No. R3001 |
| Ridgid 18V Cordless Hand Planer, Model No. R848 |
| Ridgid Heavy Duty Variable Speed Belt Sander, Model No. R2720 |
| Ridgid 9.6V Pivoting Screwdriver, Model No. R81030 |
| Ridgid 9.6V Pivoting Screwdriver, Model No. R81030 |

This list is not intended to be exhaustive, rather it indicates Accused Products that we have discovered and examined. Our investigation into additional Accused Products continues. Our investigation also shows that Emerson is involved in the manufacture, import, sale and/or offer for sale of these products.

Sorensen Research & Development is prepared to discuss reasonable terms for a license that will allow Emerson to continue to practice the '184 process in the manufacture of its products. Emerson must obtain a license under the '184 patent in order to continue importing into, manufacturing, offering for sale and/or selling the Accused Products within the United States. This requirement extends to any additional infringing Emerson products that we have not yet identified. Emerson has a legal duty to avoid infringement of United States patents. Emerson's manufacture of its plastic housings outside the United States does not avoid infringement liability when infringing products are imported into the United States.

I have enclosed for your convenience drawing numbers D-5410 and D-5411, prepared by Sorensen Research & Development. We are providing these drawings as

Mssrs. Farr and Withers
December 7, 2007
Page 5

exemplars of the Accused Products that illustrate our infringement analysis. The top view (Fig. 1) of the drawing shows the Accused Product with an exemplary section line 4-4 through the product. The sectional views shown in Fig. 4 taken along section line 4-4, and correspond to Fig. 2B of the '184 patent. Fig. 4 illustrates where each element of the patent claims appears in the Accused Product. A comparison of Fig. 4 and Figure 2B from the '184 patent (illustrated at the bottom-left of the drawing) demonstrates that the claimed limitations of the '184 patent are present in the Accused Products in the same manner as in the embodiment depicted in Figure 2B of the '184 patent. Both figures show a cross-section of the molds with the hollow products having a closed end and an open end positioned in the mold cavity formed between a first common mold part (10) and a second complementary mold part (26). The products have laminated walls (38) that extend to the rim of the products and are comprised of plastics having different characteristics. Additionally, each product has a portion of the first plastic material component (20) which functions as an identified stabilizing region (30) to impede the relative movement of the mold parts during the second injection.

Emerson's unauthorized use of the '184 patented technology is further substantiated by the enclosed claim charts associated with the attached drawings. The claim charts compare the illustrated Accused Products to claim number one (1) of the '184 patent. The first column of the claim chart quotes the text of independent claim one (1). The second column provides commentary pointing out the corresponding structure or element of the Accused Product. The third column is a remark reference number. Finally, the fourth column identifies one or more reference figures from the accompanying drawing showing the particular aspect that is the subject of the remark. For your reference, a copy of the '184 patent is enclosed.

It may be possible, although not likely, that Emerson manufactures some of the Accused Products in a manner such that production does not infringe the '184 patented process. If Emerson asserts that any Accused Product is not made with an infringing process, all parties can be best served by Emerson immediately providing us with verified evidence demonstrating the details of the Accused Process and an explanation of which required elements of the '184 patented process are absent from the Accused Process. Please be advised that we will not consider closing our files with respect to Emerson unless we agree that Emerson's verified evidence discloses a process that is non-infringing and Emerson is able to provide us with such information in the form of a legally admissible declaration. Such a declaration must be authenticated and verified under penalties of perjury under the laws of the United States of America by a U.S. corporate representative of Emerson. In the event we reach such a point in our discussions, we will provide Emerson with the form of a sworn declaration that is acceptable to us. In the absence of such countervailing evidence, our analysis leads us to the conviction that Emerson is making unauthorized use of the '184 patented technology in the manufacture of each Accused Product.

Mssrs. Farr and Withers
December 7, 2007
Page 6

**PLEASE TAKE NOTICE:** The Foregoing Is A Request Under Portions of The United States Process Patent Amendments Act Of 1988 ("PPAA"), as codified at 35 U.S.C. § 295, Seeking Factual Information Necessary To Verify Whether Products Made, Sold, Imported Into, Or Used In The United States Are Made By A Process Patented In The United States.

The United States Process Patent Amendments Act of 1988 ("PPAA") provides at 35 U.S.C. § 295 as follows:

### Sec. 295. Presumption: Product made by patented process

In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

In accordance with Section 295(2), we are hereby seeking to determine the process actually used to manufacture the Accused Product. Please provide the information requested within thirty (30) days of the date of this letter. This should provide Emerson with sufficient time to collect the required information. Sorensen Research & Development and I are prepared to hold such information in confidence.

**PLEASE TAKE FURTHER NOTICE:** This letter constitutes a notice of patent infringement in violation of 35 U.S.C. § 271. Should Emerson fail to diligently investigate this matter upon receipt of this notice, it will be considered a breach of Emerson's affirmative duty to investigate allegations of patent infringement. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580-81 (Fed. Cir. 1992); *NTP, Inc. v. Research In Motion, Ltd.*, 270 F. Supp. 2d 751, 755-58 (E.D. Va. 2003). Such breach of the duty to investigate is evidence of willful infringement of the '184 patent, which finding can support an enhancement of damages awarded pursuant to 35 U.S.C. § 284. Courts have repeatedly found that a company that

Mssrs. Farr and Withers
December 7, 2007
Page 7

intentionally undertakes the risk of importing infringing products unsupported by a thorough and competent investigation is exactly the type of activity the damages enhancement provisions of the patent law seek to prevent. *See, e.g., Domestic Fabrics Corp. v. Sears Roebuck & Co.*, 326 F. Supp.2d 694, 700 (E.D.N.C. 2004).

We recognize that Emerson very likely contracts out the fabrication of many components of its products to manufacturing agents. However, Emerson is ultimately responsible for the infringement of the '184 patent in making, importing, offering for sale or selling its products and components. Emerson's liability holds regardless of whether it makes these parts itself or through a third-party. Neither production of the Accused Products through manufacturing agents, nor production of the Accused Products outside of the United States excuses Emerson's liability for infringement of the '184 patent. Title 35, section 271 of the United States Code provides that:

> (a)    Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

Moreover, with regard to patented processes, section 271 provides:

> (g)    Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.

Sorensen Research & Development has no interest in the policing problems that are inherent in licensing contracted parts fabricators. Emerson is the party that offers to sell and sells these products in the United States. Therefore, Emerson is liable as a direct infringer for those products which infringe United States patents, including the '184 patent. To the extent that Emerson has contracted with parts fabricators in foreign countries, Emerson has further affirmatively undertaken the risk of importing infringing products into this country. That risk carries with it the serious financial consequences of patent infringement. Although having products manufactured abroad may appear to be a financially profitable decision, it does not come without the attendant potential that the foreign manufacturer unfairly makes use of U.S. patented processes thereby exposing the U.S. importer to patent infringement liability under the above-quoted Section 271(g). Furthermore, as other U.S. importers have already recognized, the burden of showing that no violation has taken place will fall to Emerson as the importer of the infringing product

Mssrs. Farr and Withers
December 7, 2007
Page 8

and the party best suited to obtain information from its foreign manufacturer regarding the nature of the Accused Process.

Emerson must recognize that licensing the '184 patented technology will allow it to continue to enjoy all the benefits and competitive advantages offered by this useful process. By contrast, failure to license its usage of the '184 patented technology can only lead to the risk and expense of litigation, an award of damages, attorneys' fees, and an injunction against further use of the Accused Process. The issuance of such an injunction would disrupt Emerson's production of the Accused Products, and idle expensive custom tooling utilized for manufacturing the Accused Products.

There are scores of businesses that have licensed their usage of the '184 patented technology. Some of those businesses include Adidas-Salomon, Atomic Ski, Bosch, BMW AG, Chicony Electronics, DaimlerChrysler AG, Mercedes-Benz, Dremel, Garmin International, Head USA, Irwin Tools, Milwaukee Electric (Milwaukee Tools), Nordica USA, Rossignol, Rubbermaid, Skil, Strait-Line, The Stanley Works (Stanley Tools), Tecnica USA. Sorensen Research & Development is committed to protecting the value to its licensees by stopping infringement wherever it is found. To protect Sorensen Research & Development's intellectual property rights, we cannot allow Emerson's unlicensed usage to continue. There is a narrow window of opportunity at this early stage wherein the parties can resolve this matter without incurring high costs and legal fees through amicable discussions leading to a license agreement. I look forward to receiving Emerson's substantive response to our infringement assertions within thirty (30) days.

Your anticipated courtesy in working with us toward a rapid and amicable resolution of this matter is greatly appreciated.

Sincerely,

Melody A. Kramer

Encl:   Drawing Nos. D-5410 and D-5411
        Claim Chart for Drawing Nos. D-5410 and D-5411
        U.S. Patent No. 4,935,184

**EXHIBIT F**

# Kramer Law Office, Inc.

9930 Mesa Rim Rd., Ste. 1600
San Diego, California 92121
Phone 858/362-3150
Fax 858/824-9073

**Melody A. Kramer, Esq.**
mak@kramerlawip.com

$c^{oty}$

## IMMEDIATE RESPONSE REQUIRED TO AVOID LITIGATION

December 7, 2007

Fred Pond, President
Ridge Tool Company
400 Clark Street
Elyria, OH 44035

### CONFIDENTIAL OFFER OF COMPROMISE
Subject To Federal Rules of Evidence § 408

RE:    Sorensen Research & Development Trust v. Ridge Tool Company, et al
        U.S. Patent No. 4,935,184

Dear Mr. Pond:

We have examined several Ridgid-brand products that incorporate plastic housings manufactured with plastics with different characteristics. From our experts' extensive examination and testing, we have determined that the plastic housings of some of these products are "substantially likely," within the meaning of 35 U.S.C. § 295, to be fabricated utilizing a process that infringes United States Patent Number 4,935,184 ("the '184 patent"). We are continuing our investigations into other Ridgid products. Our records indicate that neither Ridge Tool, nor any other company associated with the manufacture, import, sale and/or offer for sale of Ridgid products are currently licensed to utilize the '184 patented method.

I represent the Sorensen Research & Development Trust ("Sorensen Research & Development"), the owner of the '184 patent entitled "Stabilized Injection Molding When Using a Common Mold Part With Separate Complimentary Mold Parts," issued on June 19, 1990. Sorensen Research & Development is a leader in the field of plastic injection molding technology. Its patents, both U.S. and foreign, are at the forefront of advances in injection molding and disclose valuable knowledge to the plastics manufacturing industry in the form of significant improvements to the processes used for the molding of plastic products. Sorensen Research & Development licenses this valuable technology to various industries and promotes cutting-edge research and

Mr. Pond
December 7, 2007
Page 2

development efforts thereby fostering progress and the discovery of scientific advancements in injection molding. Sorensen Research & Development's patents teach innovative and cost-effective manufacturing process solutions that provide licensees with a competitive advantage. Its patents further provide companies with limited capital, or limited accessibility to highly skilled scientists, access to advancements in research and development that would otherwise be unattainable.

Specifically, the '184 patent provides a long-sought elegant solution to a pervasive problem in the injection molding of hollow plastic products. The problem solved by the patented process is that the highly pressurized injection of molten plastic forces the mold parts to move relative to each other. This mold part movement causes misalignment of the mold parts and results in products with walls of undesirable dimensional variations if not adequately controlled. The '184 patented process provides the ability to supplement and assist a number of other mold stabilization methods, such as the use of mechanical locking devices to achieve partial stabilization.

The '184 patented method facilitates production of plastic components made with two or more plastic injections with different characteristics. The '184 patented technology provides an improved method for reducing mold misalignment during the injection molding process. This method assists the manufacturer in producing parts with improved dimensional control fabricated within narrower tolerances. The improved dimensional control can be used to produce components with more refined fit and finish, improving the overall quality and appearance of the product. Moreover, the improved dimensional control can facilitate a reduction in material wasted and a reduction in manufacturing cycle time, both of which can be leveraged into reduced manufacturing cost.

The '184 patented method reduces movement of the mold parts during injection molding of laminated plastic parts produced sequentially in at least two cavities made up of at least one common mold part and at least two different complementary mold parts. The '184 patent teaches a method to stabilize the core during the second or later plastic injection by molding one or more stabilizing regions into the first plastic material component(s) that impede relative movement of the mold parts during the second or later injection. By providing this additional stabilization of the mold parts against movement during the injection process, hollow products may be produced having more controlled dimensions. Use of the '184 process offers significant benefit in the manufacture of two-plastic plastic housings and similar products.

The following table lists Ridgid products that our inspection show to be substantially likely, within the meaning of Title 35 U.S.C. § 295, to have been produced through the use of a process which infringes the '184 patent (hereinafter, "Accused Products").

Mr. Pond
December 7, 2007
Page 3

| *Accused Product, Model No.* |
| --- |
| Ridgid 18V Cordless Reciprocating Saw, Model No. R844 |
| Ridgid HD 3/8" VSR Drill, Model No. R7000 |
| Ridgid HD Reciprocating Saw, Model No. F3000 |
| Ridgid 18V Cordless ½" Hammer Drill, Model No. R8411503 |
| Ridgid 18V Cordless 1/2 " Drill, Model No. R84015 |
| Ridgid 18V Cordless Drill, Model No. R84001 |
| Ridgid 14.4V Cordless ½" Drill, Model No. R83015 |
| Ridgid 12V Right Angle Impact Driver, Model No. R82233 |
| Ridgid 14.4V Impact Driver, Model No. R82320 |
| Ridgid 12V Cordless 3/8" Drill, Model No. R82001 |
| Ridgid Heavy Duty 3 Speed ½" Right Angle Drill, Model No. R7130 |
| Ridgid Heavy Duty 2 Speed ½" VSR Drill, Model No. R7100 |
| Ridgid Heavy Duty VSR Drywall Screwdriver, Model No. R6000 |
| Ridgid Heavy Duty ½" VSR Hammer/Pulse Drill, Model No. R5010 |
| Ridgid 7 ¼" Worm Drive Saw, Model No. R3210 |
| Ridgid Heavy Duty 7 ¼" Circular Saw, Model No. |

Mr. Pond
December 7, 2007
Page 4

| ***Accused Product, Model No.*** |
| --- |
| R3200 |
| Ridgid 18V Cordless Jig Saw, Model No. R843 |
| Ridgid Variable Speed Orbital Jig Saw, Model No. R3120 |
| Ridgid Heavy Duty 11A Reciprocating Saw, Model No. R3001 |
| Ridgid 18V Cordless Hand Planer, Model No. R848 |
| Ridgid Heavy Duty Variable Speed Belt Sander, Model No. R2720 |
| Ridgid 9.6V Pivoting Screwdriver, Model No. R81030 |
| Ridgid 9.6V Pivoting Screwdriver, Model No. R81030 |

This list is not intended to be exhaustive, rather it indicates Accused Products that we have discovered and examined. Our investigation into additional Accused Products continues. Our investigation also shows that Ridge Tool is involved in the manufacture, import, sale and/or offer for sale of these products.

Sorensen Research & Development is prepared to discuss reasonable terms for a license that will allow Ridge Tool to continue to practice the '184 process in the manufacture of its products. Ridge Tool must obtain a license under the '184 patent in order to continue importing into, manufacturing, offering for sale and/or selling the Accused Products within the United States. This requirement extends to any additional infringing Ridge Tool products that we have not yet identified. Ridge Tool has a legal duty to avoid infringement of United States patents. Ridge Tool's manufacture of its plastic housings outside the United States does not avoid infringement liability when infringing products are imported into the United States.

Mr. Pond
December 7, 2007
Page 5

I have enclosed for your convenience drawing numbers D-5410 and D-5411, prepared by Sorensen Research & Development. We are providing these drawings as exemplars of the Accused Products that illustrate our infringement analysis. The top view (Fig. 1) of the drawing shows the Accused Product with an exemplary section line 4-4 through the product. The sectional views shown in Fig. 4 taken along section line 4-4, and correspond to Fig. 2B of the '184 patent. Fig. 4 illustrates where each element of the patent claims appears in the Accused Product. A comparison of Fig. 4 and Figure 2B from the '184 patent (illustrated at the bottom-left of the drawing) demonstrates that the claimed limitations of the '184 patent are present in the Accused Products in the same manner as in the embodiment depicted in Figure 2B of the '184 patent. Both figures show a cross-section of the molds with the hollow products having a closed end and an open end positioned in the mold cavity formed between a first common mold part (10) and a second complementary mold part (26). The products have laminated walls (38) that extend to the rim of the products and are comprised of plastics having different characteristics. Additionally, each product has a portion of the first plastic material component (20) which functions as an identified stabilizing region (30) to impede the relative movement of the mold parts during the second injection.

Ridge Tool's unauthorized use of the '184 patented technology is further substantiated by the enclosed claim charts associated with the attached drawings. The claim charts compare the illustrated Accused Products to claim number one (1) of the '184 patent. The first column of the claim chart quotes the text of independent claim one (1). The second column provides commentary pointing out the corresponding structure or element of the Accused Product. The third column is a remark reference number. Finally, the fourth column identifies one or more reference figures from the accompanying drawing showing the particular aspect that is the subject of the remark. For your reference, a copy of the '184 patent is enclosed.

It may be possible, although not likely, that Ridge Tool manufactures some of the Accused Products in a manner such that production does not infringe the '184 patented process. If Ridge Tool asserts that any Accused Product is not made with an infringing process, all parties can be best served by Ridge Tool immediately providing us with verified evidence demonstrating the details of the Accused Process and an explanation of which required elements of the '184 patented process are absent from the Accused Process. Please be advised that we will not consider closing our files with respect to Ridge Tool unless we agree that Ridge Tool's verified evidence discloses a process that is non-infringing and Ridge Tool is able to provide us with such information in the form of a legally admissible declaration. Such a declaration must be authenticated and verified under penalties of perjury under the laws of the United States of America by a U.S. corporate representative of Ridge Tool. In the event we reach such a point in our discussions, we will provide Ridge Tool with the form of a sworn declaration that is acceptable to us. In the absence of such countervailing evidence, our analysis leads us to

Mr. Pond
December 7, 2007
Page 6

the conviction that Ridge Tool is making unauthorized use of the '184 patented technology in the manufacture of each Accused Product.

**PLEASE TAKE NOTICE:** The Foregoing Is A Request Under Portions of The United States Process Patent Amendments Act Of 1988 ("PPAA"), as codified at 35 U.S.C. § 295, Seeking Factual Information Necessary To Verify Whether Products Made, Sold, Imported Into, Or Used In The United States Are Made By A Process Patented In The United States.

The United States Process Patent Amendments Act of 1988 ("PPAA") provides at 35 U.S.C. § 295 as follows:

**Sec. 295. Presumption: Product made by patented process**

In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

In accordance with Section 295(2), we are hereby seeking to determine the process actually used to manufacture the Accused Product. Please provide the information requested within thirty (30) days of the date of this letter. This should provide Ridge Tool with sufficient time to collect the required information. Sorensen Research & Development and I are prepared to hold such information in confidence.

**PLEASE TAKE FURTHER NOTICE:** This letter constitutes a notice of patent infringement in violation of 35 U.S.C. § 271. Should Ridge Tool fail to diligently investigate this matter upon receipt of this notice, it will be considered a breach of Ridge Tool's affirmative duty to investigate allegations of patent infringement. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580-81 (Fed. Cir. 1992); *NTP, Inc. v. Research In Motion, Ltd.*, 270 F. Supp. 2d 751, 755-58 (E.D. Va. 2003). Such breach of the duty to investigate is evidence of willful

Mr. Pond
December 7, 2007
Page 7

infringement of the '184 patent, which finding can support an enhancement of damages awarded pursuant to 35 U.S.C. § 284. Courts have repeatedly found that a company that intentionally undertakes the risk of importing infringing products unsupported by a thorough and competent investigation is exactly the type of activity the damages enhancement provisions of the patent law seek to prevent. *See, e.g., Domestic Fabrics Corp. v. Sears Roebuck & Co.*, 326 F. Supp.2d 694, 700 (E.D.N.C. 2004).

We recognize that Ridge Tool very likely contracts out the fabrication of many components of its products to manufacturing agents. However, Ridge Tool is ultimately responsible for the infringement of the '184 patent in making, importing, offering for sale or selling its products and components. Ridge Tool's liability holds regardless of whether it makes these parts itself or through a third-party. Neither production of the Accused Products through manufacturing agents, nor production of the Accused Products outside of the United States excuses Ridge Tool's liability for infringement of the '184 patent. Title 35, section 271 of the United States Code provides that:

> (a)      Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

Moreover, with regard to patented processes, section 271 provides:

> (g)      Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.

Sorensen Research & Development has no interest in the policing problems that are inherent in licensing contracted parts fabricators. Ridge Tool is the party that offers to sell and sells these products in the United States. Therefore, Ridge Tool is liable as a direct infringer for those products which infringe United States patents, including the '184 patent. To the extent that Ridge Tool has contracted with parts fabricators in foreign countries, Ridge Tool has further affirmatively undertaken the risk of importing infringing products into this country. That risk carries with it the serious financial consequences of patent infringement. Although having products manufactured abroad may appear to be a financially profitable decision, it does not come without the attendant potential that the foreign manufacturer unfairly makes use of U.S. patented processes thereby exposing the U.S. importer to patent infringement liability under the above-quoted Section 271(g). Furthermore, as other U.S. importers have already recognized,

Mr. Pond
December 7, 2007
Page 8

the burden of showing that no violation has taken place will fall to Ridge Tool as the importer of the infringing product and the party best suited to obtain information from its foreign manufacturer regarding the nature of the Accused Process.

Ridge Tool must recognize that licensing the '184 patented technology will allow it to continue to enjoy all the benefits and competitive advantages offered by this useful process. By contrast, failure to license its usage of the '184 patented technology can only lead to the risk and expense of litigation, an award of damages, attorneys' fees, and an injunction against further use of the Accused Process. The issuance of such an injunction would disrupt Ridge Tool's production of the Accused Products, and idle expensive custom tooling utilized for manufacturing the Accused Products.

There are scores of businesses that have licensed their usage of the '184 patented technology. Some of those businesses include Adidas-Salomon, Atomic Ski, Bosch, BMW AG, Chicony Electronics, DaimlerChrysler AG, Mercedes-Benz, Dremel, Garmin International, Head USA, Irwin Tools, Milwaukee Electric (Milwaukee Tools), Nordica USA, Rossignol, Rubbermaid, Skil, Strait-Line, The Stanley Works (Stanley Tools), Tecnica USA. Sorensen Research & Development is committed to protecting the value to its licensees by stopping infringement wherever it is found. To protect Sorensen Research & Development's intellectual property rights, we cannot allow Ridge Tool's unlicensed usage to continue. There is a narrow window of opportunity at this early stage wherein the parties can resolve this matter without incurring high costs and legal fees through amicable discussions leading to a license agreement. I look forward to receiving Ridge Tool's substantive response to our infringement assertions within thirty (30) days.

**Urgent attention to this matter is required. We have previously contacted you in your capacity as President of Ridgid, Inc. regarding this matter. We were referred to One World Technology as being the Accused Product manufacturer, but they have vehemently denied that they engage in such manufacture. We require straight answers forthwith.**

Your anticipated courtesy in working with us toward a rapid and amicable resolution of this matter is greatly appreciated.

Sincerely,

Melody A. Kramer

Encl:   Drawing Nos. D-5410 and D-5411
Claim Chart for Drawing Nos. D-5410 and D-5411
U.S. Patent No. 4,935,184